**Tim and Jaime LAKE, Appellants**

v.

**The HANKIN GROUP; Claremont Village Homeowners Association, c/o Shew Community Management, Inc.; and Chester Valley Engineers, Inc.; and Hankin Properties Partnership.**

Commonwealth Court of Pennsylvania.

Argued Oct. 8, 2013.

Decided Nov. 6, 2013.

---

Michael F. Eichert, Jr., Philadelphia, for appellants.

Sigmund J. Fleck, West Chester, for appellees The Hankin Group and Hankin Properties Partnership.

Gary A. Hurwitz, Media, for appellee Chester Valley Engineers, Inc.

Holly L. Setzler, West Chester, for appellees Claremont Village Homeowners Association and Shew Community Management, Inc.

BEFORE: PELLEGRINI, President Judge, COVEY, Judge, and COLINS, Senior Judge.

OPINION BY Judge COVEY.

Tim and Jaime Lake (the Lakes) appeal from the Chester County Common Pleas Court's (trial court) February 7, 2013 or-

der granting summary judgment in favor of The Hankin Group (Hankin Group), Hankin Properties Partnership (Hankin Properties), Claremont Village Homeowners' Association, c/o Shew Community Management, Inc. (Claremont Association), and Chester Valley Engineers, Inc. (Chester Valley Engineers) (collectively, Appellees). There are four issues for this Court's review: (1) whether the trial court properly concluded that the relevant statutes of limitations had expired because the alleged changes to the Lakes' property caused by flooding constituted a permanent change in the land, rather than a continuing trespass; (2) whether the Lakes' claims for equitable relief to abate flooding are subject to statutes of limitations and, if not, whether issues of material fact remain regarding laches; (3) whether the Lakes failed to join indispensable parties; and, (4) whether the Lakes' statutory and common law claims must be dismissed against a party who allegedly caused tortious storm water discharges, but no longer owns the property from which the storm water continues to flow. We reverse and remand for further proceedings.

■ The Lakes own and reside at the subject property located at 719 North Milford Road, Downingtown, Pennsylvania (Property). The Property is part of a three home subdivision which includes a property owned by Dean and Andrea Dortone (the Dortones) and another occupied by Dolores Wortley (Wortley).

Real estate formerly known as the Cairns Tract is located uphill and upgradient from the Property. Storm water from the former Cairns Tract flows from the open space, over a retaining wall, through the Cairns Pond and over the grassy area near the pond, following an unnamed tributary over the Dortones' property, through culverts under a driveway on the Dortones' property used by both the Dortones and the Lakes, for which the Lakes have an easement (the Driveway), onto the Property and into the Shamona Creek. Prior to Claremont Village's construction, storm water flowed in a dispersed manner from the former Cairns Tract to the Property.

Hankin Properties completed construction of Claremont Village in 2003 on the former Cairns Tract which, until completion, was owned by the Hankin Group. Chester Valley Engineers provided storm water calculations and design, and the erosion and sediment control plan for the project. Upon the development's completion and execution of a deed of dedication, Claremont Association has been responsible for Claremont Village's storm water management. Since Claremont Village's construction, the Property has experienced periodic flooding from Claremont Village when there has been significant rain.

Following breaches in the Cairns Pond's dam in 1999 or 2000, and 2003, the Lakes began to notice changes in the water flow coming from the Cairns Pond. Specifically, the Lakes noticed that the water flow frequency, rate and volume were increasing on a gradual basis. Therefore, the Lakes contacted Uwchlan Township officials seeking assistance; however, the Township informed them that it was not responsible and they should contact Hankin Group and Hankin Properties. The Lakes attempted to contact Hankin Group and Hankin Properties without success.

During this time, the dam breach was gradually worsening and periodically the culvert would fill with sediment which the Lakes would remove. After attempting to negotiate a resolution with Claremont Association and Hankin Group and Hankin Properties, on December 3, 2007, the Lakes along with the Dortones and Wortley sent a Notice of Intent to Sue under

the Clean Streams Law,[1] the Storm Water Management Act[2] and the federal Clean Water Act[3] to Claremont Association, Hankin Group, Hankin Properties, with copies to the Pennsylvania Department of Environmental Protection (DEP).

On January 25, 2008, after DEP conducted an investigation, it issued a Notice of Violation to Claremont Association stating:

> The [DEP] has received and investigated a complaint concerning a pond and dam that is reportedly owned by the [Claremont Association] and which receives storm water runoff.... The complaint alleges, and our investigation has confirmed, that the dam associated with the pond in question has been breached at some point in the past and has allowed uncontrolled large volumes of sediment laden water to be discharged from the pond on occasions in the past. This polluted water flows into a small creek and tributary to Shamona Creek, a High Quality water of the Commonwealth.

Reproduced Record (R.R.) at 405a. After DEP approved a corrective action plan and Claremont Association, Hankin Group and Hankin Properties implemented that plan, by November 3, 2008 letter, DEP declared that the violations had been resolved.

Once the restorative work was completed, the Driveway flooding decreased significantly from 6 to 12 incidents per year to only twice in three years. Further, sediment deposits in the culvert previously requiring removal every few weeks thereafter required far less frequent remediation. Although the matter has improved

significantly, the Lakes described the current situation:

> It exists. It's hard to say because ... frankly after so many years, I'm just tired and sick of monitoring it all the time, and going out there and looking at it, so it would be hard to calculate, but there are times [when the sediment-laden storm water flows].

R.R. at 980a.

On December 4, 2009, the Lakes filed a complaint with the trial court against Hankin Group, Claremont Association and Chester Valley Engineers. The complaint was amended twice. The Lakes' Second Amended Complaint was filed on February 7, 2012, adding Hankin Properties as a defendant, and alleging 8 counts in violation of the Clean Streams Law (Count I); the Clean Water Act (Count II);[4] the Storm Water Management Act (Count III); negligence in the design, construction, operation and maintenance of the storm water management system (Count IV); breach of landowner's duty to manage surface water (Count V); private and public nuisance (Counts VI and VII); and continuing trespass (Count VIII).

Upon completion of discovery, all defendants filed summary judgment motions. By order dated February 7, 2013, the trial court granted summary judgment in favor of all defendants. As to Count I, the trial court found that no cause of action could exist under the Clean Streams Law as to Hankin Group and Hankin Properties because they no longer possessed or controlled the former Cairns Tract. The trial court determined that the Lakes' remaining claims were time-barred.[5] The Lakes appealed to this Court.[6]

---

1. Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §§ 691.1–691.1001.

2. Act of October 4, 1978, P.L. 864, *as amended,* 32 P.S. §§ 680.1–680.17.

3. 33 U.S.C. §§ 1251–1387.

4. The Lakes voluntarily withdrew Count II.

5. The trial court noted that the appellate courts have not addressed the applicable statute of limitations for private actions brought under the Clean Streams Law. The trial court stated:

The Lakes first argue that the trial court erred by granting summary judgment based upon its determination that their claims were time-barred. Specifically, they assert a genuine issue of fact remained as to whether the floods they have experienced, and the damages therefrom, constitute a continuing trespass, given that the floods cannot reasonably be predicted, and the resulting damages are not prospectively ascertainable. We agree.

The resolution of this issue is controlled by *Graybill v. Providence Township*, 140 Pa.Cmwlth. 505, 593 A.2d 1314 (1991), *aff'd*, 533 Pa. 61, 618 A.2d 392 (1993). *Graybill* involved an action to recover damages resulting from flooding caused by the development of the defendants' property. This Court reversed a trial court's grant of summary judgment based on plaintiff's failure to comply with a two-year statute of limitations, because the Court found that the plaintiff alleged a cause of action which constituted a continuing trespass, where flooding of plaintiff's property was occasional and caused consequential, not direct or immediate, injury to the land. The Court expounded:

> A two-year statute of limitations may apply under [the Judicial Code] 42 Pa.C.S. § 5524(7). A five-year limit may apply if § 691.605(c) of the Clean Streams Law [35 P.S. § 691.605(c)], which allows the Commonwealth to levy penalties for up to five years, controls. Finally, a six-year period may apply under 42 Pa.C.S. § 5527(b). Regardless, it is our determination that the statute of limitations began to run in the fall of 2003.... Under any measure, the claim is time barred.
> Trial Ct. Op. at 2.

6. Our review of a trial court order granting summary judgment is limited to determining whether the trial court erred as a matter of law or abused its discretion. When reviewing a trial court's grant of summary

Courts have uniformly based their holdings, concerning when the statute began to run, on the distinction between permanent change (sometimes called 'original injury' or damage resulting from structures 'necessarily injurious') versus continuing trespass (also referred to as 'temporary', 'transient' or 'recurring' injury). However, the cases reveal that determination of that question usually involves the close analysis of many factors.

Among the factors that courts have considered for this purpose are the closely related questions of the ascertainability or predictability of the injury involved (i.e., whether it is possible for the plaintiff to calculate all of his future damages in one action), and the question of the regularity of the incidents of overflow (i.e., whether the incidents happen frequently and predictably or only intermittently).

. . . .

By considering the ascertainability of the plaintiff's damages, or the intermittent nature of the injury, we keep the focus of our analysis on the factor that the Restatement [of Torts § 162 (1939) ] commentary [7] ... regards as crucial,

> judgment, we must examine the record in a light most favorable to the non-moving party, accepting as true all well-pled facts and reasonable inferences to be drawn from those facts.
> *Kuniskas v. Pennsylvania State. Police*, 977 A.2d 602, 604 n. 3 (Pa.Cmwlth.2009) (citation omitted).

7. The *Graybill* Court referenced commentary from the Restatement of Torts § 162 (1939) and the Restatement (Second) of Torts § 162 (1965) containing

> examples given in both Restatements for a trespass that causes a permanent change: an *entry* onto the land of another and an affirmative act, such as an excavation, producing a permanent change *to that land*

namely, the permanence of the change *to the physical condition of the plaintiff's land,* rather than on the permanence of the defendant's structure that allegedly causes the injury.

*Graybill,* 593 A.2d at 1316–17 (citation omitted). Considering the facts, the Court explained:

Graybill has not alleged ... that he suffers flooding after every rain. Rather, as his response to interrogatories ... indicates, he alleges fewer than ten incidents of flooding over a period of almost four years, each at a time when he believes that the amount of rainfall was over one inch. Graybill has not alleged that the defendants' actions resulted in permanently submerging his land, or even that they caused such regular flooding as to have the same effect as submergence, causing him to abandon his house and to seek damages for its full value.

The damages that Graybill has enumerated include the replacement of appliances such as furnace, hot water heater and washer and dryer. In a single action to recover all damages, past, present and future, it is impossible to calculate how many such replacements should be alleged. Under these facts, it is impossible to know exactly how many incidents of flooding would occur, and the severity of them.

*Id.* at 1317–18 (citation omitted). Thus, this Court held that Graybill's claim was for a continuing trespass and therefore was not time-barred.

Here, the trial court described its basis for concluding that the Lakes suffered a permanent trespass:

*itself.* The allegations of the present case concern acts of construction by the defendant[s] ... upon their *own* land. Those acts did not directly and immediately cause any injury to Graybill's land; rather, those acts, coupled with the effects of rainfall,

Mr. Lake has observed permanent changes to his property as a result of storm[ ]water flowing over his property since at least 2003. Mr. Lake testified that in 2003 the flow of storm[ ]water increased in rate, volume and frequency and became chocolaty in color. Storm[ ]water now flowed across his property with every significant rain. '[A]ny flash flood, any rapid rain. What previously was only a heavy rain that would overtop the driveway, now even a light rain would overtop the driveway.'

In addition to the changes in the flow of storm[ ]water over his property, Mr. Lake noticed changes to his property beginning in 2003. For example, he observed that deposits of sediment were collecting. Mr. Lake noted that sediment was filling a channel, making the channel 'smaller, shallower, and as a result of the sediment deposition, grass and weeds were growing in the new sediment that had been deposited, and it was shrinking in size.' Prior to 2003 Mr. Lake could only cross the channel by jumping over it but by 2006 the channel had filled in so that he could easily step over it. Mr. Lake also observed damage to the driveway he shared with his neighbors. He 'personally observed large pieces of asphalt that we used to patch the driveway just being washed right away. That would be damage to our driveway.' The culvert, beneath the driveway, was more than half filled with sediment by 2006. Mr. Lake observed that the driveway had sunk between the culverts, which he attributed to storm[ ]water flooding.

allegedly resulted in *consequential* damage to Graybill. That distinction prevents the straightforward application of the Section 162 commentary....

*Graybill,* 593 A.2d at 1316.

Mr. Lake described permanent changes to his property dating back to 2003 as a result of storm[ ]water intrusions that were 'extreme and regular ... beginning in the fall of 2003 and continuing to the present.' Moreover, Plaintiffs unequivocally acknowledged that their causes of action had accrued as of December 3, 2007 when they sent the 60–Day 'Notice of Intent to Sue Under the Federal Clean Water Act, Pennsylvania Clean Streams Law and Pennsylvania Storm[ ][W]ater Management Act.' Plaintiffs commenced this action two years and one day later. Plaintiffs have described regular flooding coupled with physical damage, which describes a permanent trespass or nuisance. A continuing trespass or nuisance is infrequent and transient. This case does not resemble *Graybill* where storm[ ]water intrusions were intermittent and no damage to real property was described. Accordingly, Plaintiffs suffered a permanent change to their property and the statute of limitations had expired prior to their initiation of this action.

Trial Ct. Op. at 4 n. 1 (citations omitted).

We conclude the trial court erred in finding that the Lakes' action is in the

nature of a permanent trespass because, although the subject claims do describe some permanent changes to the Property allegedly caused by the flooding, the allegations also describe characteristics of continuing trespass. Notwithstanding that there have been sediment deposits and some physical damage to the Driveway has occurred, the Lakes also complain of the ongoing potential safety concerns as well as damage caused by continuing, periodic intrusion of the large amounts of water onto their property, along with the additional sediment deposits.[8]

Considering the record evidence in the light most favorable to the Lakes, as we must, and in the context of the concerns of the "ascertainability or predictability of the injury involved" and "whether it is possible for [the Lakes] to calculate all of [their] future damages in one action," we conclude that their claim is more akin to a continuing trespass. *Graybill*, 593 A.2d at 1316. *See also Cassel–Hess v. Hoffer*, 44 A.3d 80 (Pa.Super.2012). Thus, the trial court erred when it concluded that the Lakes' action is time-barred.[9]

■■■ With respect to the Lakes' second argument, we agree that the Lakes'

8. As in *Graybill*, the Lakes have "not alleged that the defendants' actions resulted in permanently submerging [their] land, or even that they caused such regular flooding as to have the same effect as submergence, causing [them] to abandon [their] house and to seek damages for its full value." *Id.* at 1317.

9. In *Miller v. Stroud Township*, 804 A.2d 749 (Pa.Cmwlth.2002), this Court found that the complaint set forth a claim for continuing trespass where the complaint alleged that: the Township constructed a sanitary sewer line on, near or about [a]ppellants' property. The construction, coupled with the effects of rainfall, resulted in a continuing trespass of water and fecal matter, which caused damage to [a]ppellants' property

and an unhealthy concentration of fungi, mold and bacteria. Under section 161 of the Restatement [ (Second) of Torts], because the Township failed to remove the water and fecal matter resulting from the sewer installation, [a]ppellants may maintain a succession of actions against the Township based on the theory of continuing trespass, or [a]ppellants may treat the continuance of water, fecal matter, fungi, mold and bacteria on the land as an aggravation of the original trespass.
*Id.* at 754 (citation omitted). Similarly, in the instant action, the Lakes have alleged that the former Cairns Tract development "coupled with the effects of rainfall, resulted in a continuing trespass of water" and sediment. *Id.*

claims for equitable relief are not subject to statutes of limitations. The Pennsylvania Supreme Court has held that:

> in the absence of fraud or concealment, it is a general rule that laches follows the statute of limitations. However, because **statutes of limitation are not controlling in equity, but only provide guidance in determining the reasonableness of any delay,** this Court has allowed suits in equity to proceed despite significant delays in bringing the action.

*United Nat'l Ins. Co. v. J.H. France Refractories Co.,* 542 Pa. 432, 440, 668 A.2d 120, 124 (1995) (citations and quotation marks omitted; emphasis added). To satisfy the laches doctrine:

> [a]ppellees must establish (1) a delay arising from [a]ppellants' failure to exercise due diligence and (2) prejudice to the [a]ppellees resulting from the delay. Whether laches is established requires a factual determination based upon the circumstances of each case. As such, it is generally an inappropriate basis for summary judgment unless the relevant facts are not in dispute.

*Stilp v. Hafer,* 553 Pa. 128, 134, 718 A.2d 290, 293 (1998) (citations omitted).

In the instant action, the trial court made no distinction between the Lakes' legal and equitable claims and did not conduct the required analysis or make the necessary factual determinations as to whether the Appellees established laches in regards to the Lakes' equitable claims. Notwithstanding, the trial court erroneously granted summary judgment on the basis that the Lakes' claims sounded in permanent trespass and, as such, were barred by the relevant statutes of limitations.

■ Although raised in the summary judgment motion but not addressed in the trial court's opinion granting the motions, the Lakes next contend that their failure to join the Dortones and Wortley in this action did not deprive the courts of jurisdiction because the neighbors are not indispensable parties. They assert that both monetary and equitable relief can be afforded without affecting the property rights of those neighbors.

■ "In Pennsylvania, an indispensable party is one whose rights are so directly connected with and affected by litigation that he must be a party of record to protect such rights, and his absence renders any order or decree of court null and void for want of jurisdiction." *Columbia Gas Transmission Corp. v. Diamond Fuel Co.,* 464 Pa. 377, 379, 346 A.2d 788, 789 (1975).[10] Although the Lakes' claims involve some land owned by the Dortones, their causes of action also arise from damage to their own property, and interference in the use of their easement.

■ We recognize that "the record owner of a fee simple in land which is the subject of a legal proceeding is a party whose rights are so directly connected with and affected by litigation that he must be a party of record to protect such rights." *Scherbick v. Cmty. Coll. of Allegheny Cnty.,* 479 Pa. 216, 220, 387 A.2d 1301, 1303 (1978) (quotation marks omitted). We further acknowledge that where an easement is the subject of litigation,

> there can be no question that the fee simple owner of the servient tenement is an indispensable party. The right to the use and enjoyment of his property will

---

10. The indispensable party issue was not waived as asserted by Hankin Group and Hankin Properties. "The failure to join an indispensable party to a lawsuit deprives the court of subject matter jurisdiction and may be raised at any time or by the court sua sponte." *Corman v. NCAA,* 74 A.3d 1149 (Pa.Cmwlth.2013).

be adversely affected by any litigation involving the easement and, therefore he must be joined. The failure to do so deprives the court of jurisdiction.

*Columbia Gas,* 464 Pa. at 379, 346 A.2d at 789. However, although the Dortones' property is affected by the alleged trespass, it is not the **"subject of"** the litigation—i.e., there is no dispute over the ownership or control of the Dortones' land or the subject easement. *Scherbick,* 479 Pa. at 220, 387 A.2d at 1303. Rather, it is the condition of the former Cairns Tract that is allegedly causing the Lakes' damages. Moreover, "[a] party is indispensable when his or her rights are so interconnected with the claims of the litigants that **no** decree can be made without impairing those rights." *Sprague v. Casey,* 520 Pa. 38, 48, 550 A.2d 184, 189 (1988) (emphasis added). In the instant action, the Lakes seek both money damages and equitable relief. Considering the facts in the light most favorable to the Lakes, it is clear that if the Lakes successfully prove their claims, money damages could be awarded to the Lakes without impairing the Dortones' and Wortley's rights. In addition, because the alleged flooding begins on the former Cairns Tract, which is property controlled by Claremont Association—a party to this litigation—and merely crosses the Dortones' and Wortley's properties, a decree could be fashioned directing Appellees to address the flooding without impairing the non-party property owners' rights. Thus, we conclude that the Dortones and Wortley are not indispensable parties.[11]

Finally, the Lakes argue that the trial court erred when it concluded that they could not pursue a cause of action under the Clean Streams Law against Hankin Group and Hankin Properties because those entities no longer have control over the property from which the storm water flows and thus have no ability to abate a violation. The Lakes further assert that the fact that Hankin Group, Hankin Properties and Chester Valley Engineers' lack ownership of the former Cairns Tract is not a defense to the claims against them. We agree.

The Clean Streams Law permits private actions to be commenced to compel compliance with its provisions. 35 P.S. § 691.601(c). Specifically, Section 601(c) of the Clean Streams Law provides in relevant part:

any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this act or any rule, regulation, order or permit issued pursuant to this act against the department where there is alleged a failure of the department to perform any act which is not discretionary with the department or **against any other person alleged to be in violation** of any provision of this act or any rule, regulation, order or permit issued pursuant to this act.

35 P.S. § 691.601(c) (emphasis added).

Hankin Group and Hankin Properties contend that they cannot be held liable

---

**11.** If during the pendency of this action, the trial court concludes that the Dortones and/or Wortley are indispensable parties, the trial court may order their joinder pursuant to Pennsylvania Rule of Civil Procedure No. 2232(c) which states:

At any stage of an action, the court may order the joinder of any additional person who could have joined or who could have

been joined in the action and may stay all proceedings until such person has been joined. The court in its discretion may proceed in the action although such person has not been made a party if jurisdiction over the person cannot be obtained and the person is not an indispensable party to the action.

under the Clean Streams Law as a "person ... in violation" because they cannot **presently be in violation** since they no longer have an interest in the former Cairns Tract. *Id.* The Restatement (Second) of Torts, § 161 (1965) states in relevant part, "(1) A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor has tortiously placed there, whether or not the actor has the ability to remove it." The comment to Subsection 1 of Section 161 of The Restatement (Second) of Torts provides, in pertinent part:

> b. *Continuing trespass.* The actor's failure to remove from land in the possession of another a structure, chattel, or other thing which he has tortiously erected or placed on the land **constitutes a continuing trespass for the entire time during which the thing is wrongfully on the land** and ... confers on the possessor of the land an option to maintain a succession of actions based on the theory of continuing trespass or to treat the continuance of the thing on the land as an aggravation of the original trespass. . . .

Illustration:

> 1. **A, without B's consent or other privilege to do so, erects on his own land a dam which backs up water on B's land. This is a trespass, which continues so long as A maintains his dam in such a way as to flood B's land.**

> c. *Effect of actor's inability to remove the thing.* Since the conduct of the actor in placing the thing on the land is tortious, his responsibility for its presence on the land continues ... although through subsequent conduct on his part it has now become impossible or impracticable for him to terminate the intrusion on the other's land. In this respect, the liability of one who has tortiously placed a thing on another's land is more stringent than the liability of his transferee (see Comment f) or the liability of one who has placed a thing on another's land pursuant to a revocable license (see § 160). In those cases, the actor's responsibility is merely for a violation of a duty of removal and, if the circumstances are such as to make it impossible for him to perform such duty, he is excused from liability for its non-performance.

Illustration:

> 2. The same facts as in Illustration 1, except that after building the dam, A **transfers to C his interest in the land on which he had erected the dam. Although A cannot now demolish or reduce the level of the dam or lower the flood gate without committing a trespass against C, he is nevertheless under liability to B for the continuance of the flooding of B's land.**

Restatement (Second) of Torts, § 161, cmts. b, c. (1965) (emphasis added). Accordingly, because evidence may establish that Hankin Group's and Hankin Properties' alleged trespass purportedly continues to cause violations of the Clean Streams Law, their argument fails. Therefore, we conclude that Hankin Group and Hankin Properties may be found to be in violation of the Clean Streams Law even though they no longer have an interest in the property from which the storm water flows.

Further, the trial court's conclusion that the Lakes cannot pursue claims under the Clean Streams Law against Hankin Group and Hankin Properties because they no longer own the property and, thus, cannot abate the violation is also erroneous. Claremont Association, the entity that does currently control the former Cairns Tract, is a party to this litigation, and therefore it is possible that, if warranted,

equitable relief against Hankin Group, Hankin Properties and Chester Valley Engineers could be fashioned in conjunction with an order directing Claremont Association to permit such corrective action.

For all of the above reasons, the trial court's order is reversed and the matter is remanded for further proceedings in accordance with this opinion.

Judge COHN JUBELIRER did not participate in the decision in this case.

## ORDER

AND NOW, this 6th day of November, 2013, the Chester County Common Pleas Court's February 7, 2013 order is reversed and this matter is remanded for further proceedings in accordance with this opinion.

Jurisdiction is relinquished.